THEODORE L. SENDAK, ATTORNEY GENERAL *v.* THE TRUSTEES OF PURDUE UNIVERSITY.

[No. 471A60. Filed March 16, 1972.]

*Theodore L. Sendak,* Attorney General, *Robert F. Hassett,* Deputy Attorney General, for appellant.

*Carl W. Kloepfer, George T. Schilling, John R. Gambs, Stuart, Branigin, Ricks & Schilling,* of Lafayette, for appellee.

HOFFMAN, C.J.—This is an appeal from a final judgment which removed certain restrictive provisions of a charitable trust instrument establishing a student loan fund. The specifications of error preserved by appellant, Attorney General of Indiana, raise two issues: (1) Whether the decision and order of the trial court is sustained by sufficient evidence; and (2) Whether the decision and order of the trial court is contrary to law.

The charitable trust was created under the terms of the Last Will and Testament of Hamlin K. Buchman dated March 4, 1960. Hamlin Buchman died April 12, 1962. The residuary clause of such will reads, in pertinent part, as follows:

"6th The balance—and residue of my estate,
        I devise, and bequeath as follows:
        (9/10 thereof to Purdue University of Lafayette,
        (Indiana, in trust perpetually for the following pur-
        (poses.
"A"  (  (a) To constitute a fund to be loaned to under-
        (graduate students of Purdue University—in the third
        (year—or more advanced students. No student to
        (receive more than Five Hundred dollars. Interest on
        (loan to be determined by the University—the Trust
        (or foundation to be known as Etta Buchman, by her

(sons Harry and Hamlin. Repayment of loans to be
(within 5 years from date of loan."

On May 19, 1970, plaintiff-appellee, the Trustees of Purdue
University (University) filed its complaint with the clerk of
the trial court praying that certain restrictions be removed
from the trust. Its complaint included, *inter alia*, the follow-
ing paragraph:

"6. Plaintiff has administered this fund for more than
seven years but has been unable to loan even the aggregate
income of the fund because of the following restrictive
administrative provisions contained in the will of Hamlin
Buchman, namely:

(a) The restriction that only $500 can be loaned to any
one student.

(b) The restriction that loans can be made only to
undergraduate students in the third year, or more advanced
students.

(c) The restriction that each loan must be repaid within
five years from its date."

After hearing the evidence, the trial court, at the request
of plaintiff-University, entered its findings of fact and con-
clusions of law. The trial court then entered its order that
the three requested restrictions be removed and abolished
and that the Trustees of Purdue University are empowered
to use the principal and interest of any and all funds con-
stituting assets of the Buchman Loan Fund for the purpose
of making loans to students attending Purdue University
on substantially the same terms, conditions and provisions
which the Trustees have established, or may from time to time
hereafter establish, with respect to loans made from the
general unrestricted student loan funds of Purdue University.

From this judgment the appellant-Attorney General has
perfected this appeal. Appellant primarily contends that the
doctrine of *cy pres* is inapplicable because the residuary clause
of Buchman's will shows the "charitable purpose" for which
the trust was specifically intended, to-wit: A loan fund for

"students of Purdue University—in the third year—or more advanced * [n]o student to receive more than Five Hundred dollars * * * [r]epayment of loans to be within 5 years from date of loan."

The trial court, however, has made a contrary finding of fact as to the trust's ultimate purpose, as follows:

"11. The Buchman Loan Fund is a charitable trust with the primary purpose of promoting education through the medium of making low cost loans available to students."

Under Rule TR. 52(A) (3), Indiana Rules of Procedure, this finding will not be disturbed unless it is clearly erroneous. Such finding will be affirmed if supported by evidence of probative value. *Houser et al. v. Bd. of Comm.* (1969), 252 Ind. 301, 310, 247 N. E. 2d 670.

In the instant case the stipulation of facts states that during frequent visits to the City of Lafayette, Hamlin Buchman became acquainted with Purdue University and with Mr. Bert E. Loeb, a resident of Lafayette and one of the principal benefactors of Purdue University.

A reasonable inference drawn from these facts shows a motivating influence for creating the trust. Also, the following testimony, on direct examination, of Arthur Tyler, Assistant Director of Financial Aids of Purdue University is contained in the record before us:

"Q. Have you recently—heard recently—come across some information which might lead you to believe as to why Hamlin Buchman put in the restrictions that he did?
* * *
"A. [T]he limits of the Purdue University Loan Fund, which has been in existence almost twenty years up to 1958, had a maximum of $400.00 loan outstanding of any one student at any one time. The loans were to be made to freshmen only in extreme cases.
* * *
"Q. In fact, that knocked out freshmen, I imagine—
"A. Yes, the records that I have seen indicate most freshmen loans were made from the Purdue University Loan

Fund until about 1966, so this effectively curtailed the freshman loan action in that period of time. The graduate student had the same limit, $400.00. The repayment period was a maximum length of one year payable at the due date. If the student was still in school, he could have the note renewed, but when he left school, the note was expected to be repaid at the due date.

"Q. So these would show some similarity between—in fact they were a little bit stricter than what the restrictions Hamlin Buchman imposed upon his fund?

"A. Yes. The terms of the Buchman were spelled out in slightly more liberal terms than these and it ties in with the proposed fund which the Trustees then adopted at that period of time in 1958 where they raised the maximum from $400.00 to $500.00 for one year. * * *."

From the above testimony it is apparent that Buchman intended to place more lenient restrictions on the administration of the Buchman Trust than were placed on other loans made by the University. Other loans made at that time were restricted to $400 per student, repayable within one year from graduation, with few loans to freshmen. Compared to this the Buchman Fund was restricted to $500 per student of the third year or more, payable within five years from the date of the loan.

Furthermore, a reasonable construction of the trust document itself shows that the desired purpose was "[t]o constitute a fund to be loaned to undergraduate students of Purdue University * * *.", with the remaining language intended to be directions for the administration of the trust. We will, therefore, not disturb the finding of the trial court that the primary purpose of the trust was to promote education through the medium of making low cost loans available to students.

In *Quinn* v. *Peoples Trust & Savings Co.* (1945), 223 Ind. 317, at 332, 60 N. E. 2d 281, at 285, our Supreme Court stated:

"The doctrine of judicial *cy pres* permits a court of equity to direct the use of property, given to a charity, to as nearly the same purpose as possible, when the original plan or trust becomes impossible or inexpedient or illegal.

"In the Restatement of the Law of Trusts, § 399, p. 1208, the doctrine of *cy pres* is spoken of in the following language:

'If property is given in trust to be applied to a particular charitable purpose, and it is or becomes impossible or impracticable or illegal to carry out the particular purpose, and if the settlor manifested a more general intention to devote the property to charitable purposes, the trust will not fail but the court will direct the application of the property to some charitable purpose which falls within the general charitable intention of the settlor.'"

We therefore conclude that the doctrine of *cy pres* is inappropriate in the instant case because the charitable purpose of the trust has not become impossible, impractical or illegal, even if the restrictions are imposed.

The doctrine of *cy pres* was distinguished from the problem with which we are here concerned in Bogert, Trusts 2nd Ed., § 394, at 236-237, as follows:

"The cy pres power is discussed in a later chapter. Under it where the charitable trust purpose has become impossible or impracticable of accomplishment the court may alter the objective of the trust by substituting another trust purpose which it deems to be as nearly as possible like that of the settlor. This is remodelling the trust by changing the purpose which the trustor had chosen as a means of bringing about public benefit. It is not merely changing machinery of administration, that is, the ways which the settlor had prescribed for the conduct of the work of the trustee.

"The court possesses a second important power, namely, that of changing, or permitting the trustee to change, the methods of administration set forth in the trust instrument, when this is deemed necessary or highly desirable in order to enable the trustee to perform the trust. This is called the power of the court to sanction deviation from the terms

of the trust. The difference between this power and the cy pres power is not always observed by the courts. Sometimes an order which merely relieves the trustee of a handicapping limitation found in the trust instrument or merely permits the trustee to use funds to forward the original purposes of the trust in new ways, is called the use of cy pres; whereas in reality it is a departure from the prescribed methods of operation without in any way varying the end results which the donor envisaged. While the effects of using these two powers are similar, the procedure, formalities, and evidence required for the use of one power may be different from the requirements applying to the use of the other power. Thus, reference to a master to frame a scheme under the cy pres power may be required by law or be customary under the usual practice, whereas it may not be needed in the application of the authority to permit deviation. Deviation from the administrative provisions of a charitable trust can be authorized, even though the trust possessed a narrow and not a general trust intent, whereas cy pres could not be used in such a case." [Footnotes omitted.]

Similarly, 2 Restatement of Trusts 2d, § 381, at 273, states:

"Deviation from Terms of the Trust

The court will direct or permit the trustee of a charitable trust to deviate from a term of the trust if it appears to the court that compliance is impossible or illegal, or *that owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust.*" (Emphasis supplied.)

Here the ultimate purpose of the trust has not become impossible, impractical or illegal. The problem, as shown by the evidence, is that the method established by the settlor for the administration of the trust has so hampered the intended use of the trust fund that the trust has become nearly dormant.

We will not attempt to set forth all of the testimony introduced into evidence. It will here suffice to say that the evidence adduced by the plaintiff, taken as a whole, provides sufficient evidence of probative value upon which the trial

court's findings and judgment were based. The effect of much of the testimony in the record before us was succinctly summarized by the trial court in its Finding No. 7:

> "In the ten years since Hamlin Buchman made his will, the factors and circumstances affecting the cost of attending institutions of higher learning have changed radically. Tuition, fees, living expenses and other actual dollar costs to students have increased sharply. At the same time, inflation has made each dollar worth substantially less. Greater numbers of students are attending colleges and universities. As a result of these changing circumstances, the number of students requiring financial assistance is much greater than it was ten years ago, and the amount of financial assistance needed by individual students is also much greater than it was ten years ago. * * *."

There is other evidence in the record showing that the application of the three restrictions in question would cause further accumulation of assets in the fund with comparative little aid to needy students. We, therefore, conclude not only that the judgment of the trial court was based on sufficient evidence, but that the trial court's application of the doctrine of equitable deviation was in accordance with law. As above stated, the doctrine of *cy pres* is inapplicable here for at least one, if not two, reasons. First, *cy pres* may be invoked where the *ultimate trust purpose* has become impossible, impractical or illegal. The *purpose* of the Buchman trust remains possible, practical and legal. Secondly, although the issue need not here be decided, it could well be argued that the settlor intended to specifically benefit only the students of Purdue University, thus preventing the application of *cy pres*.

On the other hand, the circumstances of the instant case make the application of the doctrine of equitable deviation appropriate. Under this doctrine the court will permit the trustees to deviate from the mechanical means of administration of the trust where circumstances not known or foreseen by the testator have come about, and where such change in circumstances in combination with the admin-

istrative means provided in the trust would defeat or substantially impair the accomplishment of the intended trust purpose. *Bank of Delaware* v. *Buckson* (1969), Del. Ch., 255 A. 2d 710; *State* v. *Coerver* (1966), 100 Ariz. 135, 412 P. 2d 259; *Reed* v. *Eagleton* (1964), 384 S. W. 2d 578; *Craft* v. *Shroyer* (1947), 81 Ohio App. 253, 74 N. E. 2d 589.

The Appellate Court of Indiana applied the doctrine of equitable deviation in the case of *Foust* v. *William E. English Foundation* (1948), 118 Ind. App. 484, 80 N. E. 2d 303, (transfer denied). The doctrine of equitable deviation was further discussed in 24 Ind. L. J. 464 (1948-49).

In the instance case, it can hardly be argued that the testator, in 1962, could possibly have foreseen the numerous and diverse economic and social changes that have since occurred. The practical effect of adherence to the three provisions in question would negate the charitable intent of Hamlin K. Buchman in establishing the "Etta Buchman Loan Fund by Her Sons Hamlin and Harry."

The judgment of the trial court is affirmed.

Sharp, J., concurs; Staton, J., concurs in result.

NOTE.—Reported in 279 N. E. 2d 840.